THE NEW YORK AND BALTIMORE TRANSPOR-
TATION LINE AND THE SOUTHERN PACI-
FIC COMPANY *vs.* LEWIS BAER
& COMPANY.

*Common carriers: lost goods; liability to consignee; initial
and terminal carriers; Hepburn Act; Carmack's amend-
ment; weight of goods; evidence; copies of invoice.
bill of lading; statement of local freight agent.*

Where a common carrier is not an initial carrier, there is no liability either under the Hepburn Act nor under the Carmack Amendment to that Act, for loss or damage to goods forwarded over its lines by other carriers.          p. 78

Such a carrier is responsible only according to the liability imposed upon it by the Common Law.          p. 78

Where goods are transported by successive carriers, if it be shown that they were delivered to the initial carrier in good condition, and they were subsequently delivered to the consignee by a connecting or terminal carrier in bad condition

the presumption is, when such last named carrier is made
defendant that the goods were received by it in the same
condition they were delivered to the initial carrier, and the
burden is upon the defendant carrier to prove by way of
defense, that such goods came into its possession in a dam-
aged condition.                                  p. 79

A provision in a bill of lading that the carrier shall not be
liable for loss, damages or injury not occurring on its own
road or its portion of the through route nor after the prop-
erty has been delivered to the next carrier, is in harmony
with the Common Law, and does not limit the carrier's
Comon Law liabilities.                            p. 81

To create a presumption of law that the shortage or loss of
goods occurred on the line of a terminal carrier or while
in its possession, it is necessary (at Common Law) to show
that the goods of the quantity named were delivered to the
initial carrier, and that all of the goods were not delivered
by the terminal carrier to the consignee.        pp. 85-86

While bills of lading are high and authentic evidence of the
quantity and condition of the goods when they were received,
like other receipts, they may be explained.      p. 86

In a case against a terminal carrier for damages for the loss
of goods, *it was held* that there was evidence in the case
proper to go to the jury to show that the goods had been
delivered to the initial carrier.                p. 88

Where a certain quantity of goods is delivered to one carrier,
and all were not delivered to the consignee, by the terminal
carrier, *it was held* that an action *in tort* for damages was
properly brought against both carriers.          p. 88

Where a bill of lading declared that the amount of any loss
or damage for which the carrier is liable, should be computed
on the value of the property at the place and time of ship-
ment, etc., it is an error to instruct the jury that the measure
of damages should be the "fair market value of the shortage
of goods at the place of delivery, etc., with interest in the
discretion of the jury."                         p. 89

*Quaere* as to the admissibility of copies of an invoice as
evidence of or weight of the goods shipped.      p. 89

The statement of a local freight agent of a railroad, that in his judgment a shipper or consignee had a claim against the railroad, is not admissible in evidence against the railroad when it is not shown that he had any authority to pay, settle, or even admit the payment of a claim or that he was permitted by the company to hold himself out as an agent having such authority.                                    p. 89

When there is a claim against a carrier for the loss of goods in transit, and when a bill of lading has a provision in relation thereto a defendant company may show the ordinary shrinkage that would occur in the goods shipped between the time of their receipt and delivery.                       p. 90

*Decided March 27th, 1912.*

Appeal from the Baltimore City Court (ELLIOTT, J.). The facts are stated in the Opinion of the Court.

The following are the prayers that were offered by the plaintiff and by the defendants and the Court's action on each:

*Plaintiff's First Prayer*—The Court instructs the jury that if they find from the evidence that the three shipments testified to were made to the plaintiffs upon what is known as "Order Bills of Lading," and that such shipments, when delivered to the carriers by the consignors, were in good condition for carriage to their destination, and if they shall further find that the New York and Baltimore Transportation Company, one of the defendants herein, tendered to the plaintiffs the aforesaid shipments, and demanded of the plaintiffs payment of the freight thereon, and if they shall further find that said plaintiffs paid said defendant the freight charged by said defendants for said shipments and received from said defendant said shipments, and if they shall further find that when said shipments were so tendered by said defendant to the plaintiffs and received by said plaintiffs, said shipments were in bad condition, and that a large quantity of the wool, representing said shipments was laying loose upon a scow, and that said plaintiffs were required to gather up said loose wool and take the same from the scow, and if they shall further find that the aggregate weight of said shipments, as so delivered to the plaintiffs, by said defendant, was less than the aggregate weight of said shipments when delivered to the carriers by the consignors, then the verdict of the jury must be in favor of the plaintiffs, and the measure of damages

is the fair market value of the shortage of wool at the place of delivery, to wit, at Baltimore, Md., at or about the time of the delivery, with interest upon the amount found to be due from July 7th, 1909, in the discretion of the jury. (*Granted.*)

*Defendants' First Prayer*—The defendants pray the Court to instruct the jury that under the pleadings there is no evidence in this case legally sufficient to entitle the plaintiff to recover, and, therefore, the verdict of the jury must be for both defendants. (*Refused.*)

*Defendants' Second Prayer*—The defendants pray the Court to instruct the jury that the two defendants, the Southern Pacific Company and the New York and Baltimore Transportation Line, are liable only for the loss or damage to the sacks of wool or their contents, herein sued for, that occurred on their respective lines, and that neither one of them is liable for any loss or damage to the sacks of wool or their contents herein sued for, that occurred upon the lines of any carriers other than the New York and Baltimore Transportation Line and the Southern Pacific Company. (*Granted.*)

*Defendants' Third Prayer*—The defendants pray the Court to instruct the jury that if they find from the evidence in this case that the loss of certain wool herein sued for, or any portion thereof occurred or was caused alone by reason of the fact that the shippers who packed the same for transportation over the lines of carriers, by whom the same were to be carried from the various points of shipment to Baltimore, packed the same in defective or unsafe bags or sacks, or did not use due care in packing the same, then the defendants are not liable for any such damages. (*Granted.*)

*Defendants' Fourth Prayer*—The defendants pray the Court to instruct the jury that if they find that the difference between the weight or weights of the wool as the same were at the time they were first delivered to the carriers, and the weight or weights of the same at the time when they were weighed by Lewis Baer and Company in Baltimore, was due to the fact that the wool, during the course of its transit from the original point of shipment to Baltimore, dried out, then the verdict of the jury must be for the defendants. (*Granted.*)

*Defendants' Fifth Prayer*—The defendants pray the Court to instruct the jury that as there is no legally sufficient evidence of any damage to the plaintiffs, the verdict of the jury can be for only nominal damages. (*Refused.*)

*Defendants' Sixth Prayer*—The defendants pray the Court to instruct the jury that as there is no legally sufficient evidence in this case of any damage to the plaintiffs under the first count of their declaration, the verdict of the jury thereunder must be for only nominal damages under this count. (*Refused.*)

*Defendants' Seventh Prayer*—The defendants pray the Court to instruct the jury that as there is no legally sufficient evidence in this case of any damage to the plaintiffs under the second count of their declaration, the verdict of the jury thereunder must be for only nominal damages under this count. (*Refused.*)

*Defendants' Eighth Prayer*—The defendants pray the Court to instruct the jury that as there is no legally sufficient evidence in this case of any damage to the plaintiffs under the third count of their declaration, the verdict of the jury thereunder must be for only nominal damages under this count. (*Refused.*)

*Defendants' Ninth Prayer*—The defendants pray the Court to instruct the jury that if they find from the evidence in this case that in any one shipment any of the alleged loss of wool was due to the default or neglect of one of the defendants and not of the other, and if they further find that in any of the other shipments any loss or damage to the plaintiffs to said shipments was incurred by reason of any neglect or default of the other defendant, then the verdict of the jury must be in favor of both defendants.   (*Refused.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*J. Morfit Mullen* and *W. Calvin Chesnut* (with whom were *Gans* and *Haman* on the brief), for the appellants.

*Myer Rosenbush*, for the appellees.

PATTISON, J., delivered the opinion of the Court.

The amended declaration in this case alleges in the first count thereof that on or about the 15th day of June, 1909, the appellants, defendants below, as common carriers, "received and accepted certain freight, to wit: a large quantity of wool in bags, the aggregate weight of which was approximately eight thousand pounds, for delivery to the plaintiffs, at Baltimore, Md., for which said defendants received the compensation charged by them, which was predicated upon the weight of said shipment; that when said shipment was delivered by the defendants to the plaintiffs.

the same was in bad condition, the said shipment was approximately 225 pounds less in weight than the weight of the shipment received by said defendants for delivery to these plaintiffs as aforesaid; that the condition of said wool, and the shortage thereof, was due to the recklessness, carelessness and negligence on the part of said defendants, and each of them * * * in the transportation of said wool, and was caused by the lack of 'due care and caution on the part of said defendants, and each of them, * * * in the transportation of said wool from the point of its shipment to its destination, and by reason thereof, said plaintiffs have suffered great loss and damage."

The second and third counts, the only remaining counts of the declaration, are brought to recover damages for further losses alleged to have been suffered by the plaintiffs in the transportation of other wool received by the defendants on June 17th and 18th, 1909, respectively. The language of these counts is in every other respect identical with that of the first.

To this declaration the defendants pleaded that "they did not commit the wrongs therein alleged," and upon joinder of issues the case was tried by jury and a verdict was rendered in favor of the plaintiff for the sum of $216.02. In the course of the trial ten exceptions were taken to the rulings of the Court upon the admission of evidence, and one to the rulings upon the prayers.

The evidence discloses that the wool mentioned in the first count of the declaration, consisting of one hundred and one sacks, was shipped from Buma, Texas, over the Gulf, Colorado and Santa Fe Railway and by it a bill of lading was issued to the shipper, J. W. Pavell, in which Wm. E. Voelkel & Son, New Orleans, La., were named as the consignees. We also find from the evidence that a bill of lading was likewise issued for this same shipment of wool by the Morgans' Louisiana and Texas Railroad and Steamship Company, wherein the consignee is Lewis Baer & Co.,

Baltimore, Md. The authority of this seems to be found in the following order:

"MR. HAMMOND:

Please direct this shipt. via. Morgan Line to Lewis Baer & Co., Baltimore, Md.

WM. E. VOELKEL & SON."

There is no evidence in the record explicitly showing the reason or necessity for the existence of the two bills of lading.

The wool mentioned in the second and third counts of the declaration, one shipment consisting of seventy-eight and the other of one hundred and twelve sacks of wool, was shipped over the Kansas City Southern Railway on June 17th and 18th, respectively, the lot of seventy-eight sacks from Singer, La., and the lot of one hundred and twelve sacks from Leesburg, La., and bills of lading were issued by said company as of the dates of shipment to Charles J. Davis, in both of which Wm. E. Voelkel & Son, Baltimore, Md., were consignees, but on the back of each of these bills of lading was found this endorsement: "Wm. E. Voelkel & Son, deliver to Lewis Baer & Co."

These three shipments of wool upon reaching New Orleans were loaded upon the steamship El Alba, of the Southern Pacific Company, one of the defendants to this suit, and were by said steamer carried to New York, from which point they were transported over the lines of the New York and Baltimore Transportation Company, the other defendant to this suit, to Baltimore City, the point of destination. The wool after reaching Baltimore City was taken from the steamer of the last named company and loaded in a scow and from the scow was delivered to the plaintiffs. At the time of its delivery the plaintiffs state that many of the sacks were torn and in bad condition and much of the wool was loose in the scow, and by reason of the condition of the sacks it was impossible for them to distinguish one lot or shipment from another, and thus the whole of it, without attempting to separate it, was hauled to the plaintiffs' place

of business, at which place all of it was weighed by them and was found, as the plaintiffs allege, to be much less in weight than when received by the defendants to be delivered to them. It is for this shortage of weight that this suit was instituted.

It is true, the declaration alleges that "the shipment was delivered in bad condition," and that the "condition of said wool" was due to the negligence of the defendants. From this it might appear that the plaintiffs were attempting to recover for losses owing to a damaged condition of the wool delivered, as well as the failure of the defendants to deliver to the plaintiffs all of the wool that they claim should have been delivered to them, yet the record discloses no effort made on the part of the plaintiffs to show that the wool actually delivered was in a damaged condition, but it discloses that the "bad condition" referred to, was in respect to the sacks or bags in which it was packed; and does not disclose that the wool so delivered to them was in a damaged condition.

In none of the shipments of wool was either of the defendants the initial carrier, and in none of them was the Southern Pacific Company the terminal carrier, but the New York and Baltimore Transportation Line was the terminal carrier in all of them. As neither of the defendants is the initial carrier, they are not in this case in any wise affected by the Act of Congress called the Hepburn Act with the amendment thereto known as the Carmack Amendment, and are, therefore subject only to the liability imposed upon them by the common law. We will therefore inquire, what is this liability?

In the case of *Michigan Central Railroad Co.* v. *Myrick*, 107 U. S. 107, the Court said: "A railroad company is a carrier of goods for the public and as such is bound to carry safely whatever goods are entrusted to it for transportation in the course of business to the end of its road and to deposit them in a suitable place for their owners or consignees. If the road of the company connects with other roads and goods are received for transportation beyond the termination of its

own line, there is superadded to its duty as a common carrier that of a forwarder by the connecting line, that is, to deliver safely the goods to such line, the next carrier on the route beyond. This forwarding duty arises from the obligation implied in taking the goods for the point beyond its own line. The common law imposes no greater duty than this. If more is expected from the company receiving the shipment, there must be a special agreement for it. Each road, confining itself to its common law liability, is only bound, in the absence of special contract, to safely carry over its own road and safely deliver to the next connecting carrier." This is the established law in Maryland as well as in other parts of the country. *Shockley* v. *Penn. R. R. Co.,* 109 Md. 128; *Hoffman* v. *Cumberland R. Co.,* 85 Md. 392. And this is true as to an intermediate carrier that accepts property for carriage directed to a place beyond the terminus of its route.

Another principle of law, well established in this State, is: "Where goods are transported by two or more successive carriers, it is the prevailing doctrine in this country, that if it be shown that the goods were delivered to the initial carrier in good condition, and they were subsequently delivered to the consignee by the connecting and terminal carrier in bad condition, the presumption of law is, when such last named carrier is made defendant, that the goods were received by such defendant in the same condition that they were delivered to the initial carrier, and the burden is upon the defendant carrier, of proving that such goods came to its possession in a damaged condition, by way of defense." *P. B. & W. R. R. Co.* v. *Diffendal,* 109 Md. 505; *Laughlin* v. *C. & N. W. Ry. Co.* 28 Wis. 204; *Savannah, etc., Ry. Co.* v. *Harris,* 26 Fla. 148; *Penn. R. R.* v. *Naive,* 112 Tenn. 239 (79 S. W. 130); *Beard* v. *Ill. Central,* 79 Iowa, 518 (7 L. R. A. 280); *Cane Hill & Co.* v. *San Antonia,* 95 S. W. R. 751; *Elliott on Railroads,* sec. 1450; 3 *Hutchinson on Carriers,* sec. 1348.

What is said in the case of *P. B. & W. R. R. Co.* v. *Diffendal* as to the presumption of law in respect to the terminal carrier, when it is once shown that the goods were delivered to the initial carrier in *good condition,* applies also as to the *quantity* so delivered to such carrier. That is to say, if upon the delivery to the consignee by the terminal carrier, there is found a shortage in the quantity of goods that had been delivered to the initial carrier, the presumption is, when such last named carrier is made defendant, that all the goods delivered to the initial carrier were received by the terminal carrier, and the burden is upon such terminal carrier of proving that the goods so delivered by it to the consignee were all the goods that came into its possession.

With this statement of the law we will proceed to give a statement of the facts as disclosed by the evidence found in the record.

As was said, the bills of lading were issued in each of the shipments of wool heretofore mentioned. The bills of lading for the shipment from Buma, Texas, issued by the Morgans' Louisiana and Texas Railroad and Steamship Company and the Gulf, Colorado & Santa Fe Ry. Co., both give the number of sacks at one hundred and one and the weight of the wool at 8235 pounds. The bill of lading for the wool shipped from Singer, La., dated June 17th, 1909, issued by the Kansas City Southern Ry. Co., gives the number of sacks at seventy-eight and the weight of the wool at 9234 pounds; and the bill of lading for the wool shipped from Leesburg, La., June 18th, 1909, issued by the last named railway company, gives the number of sacks at one hundred and twelve and the weight of the wool at 6098 pounds, making the total amount of wool in the three shipments 23,657 pounds, as disclosed by the bills of lading.

The bills of lading, among other provisions, contain the following: (1) No carrier or party in possession of any of the property herein described shall be liable for any loss thereof or damage thereto caused by the act or default of the shipper or owner, or for difference in the weight of

grain, seed or other *commodities caused by natural shrink-age;* (2) all property shall be subject to necssary cooper-age and baling at owner's cost; and (3) no carrier shall be liable for loss, damage or injury not occurring on its own road or its portion of the through route, nor after said property has been delivered to the next carrier." The latter provision is in entire harmony with the common law liabil-ity imposed upon the carrier, and in no sense limits its lia-bility thereunder.

In addition to the bills of lading, the plaintiffs offered the deposition, taken at New Orleans, of Charles J. Davis, wool buyer for Wm. E. Voelkel & Son, Baltimore, Md., and the party named in the bills of lading issued by the· Kansas City Southern Ry. Co., at Singer, La., June 17th, 1909, and at Leesburg, La., June 18th, 1909, in which deposition he was asked: "What was the condition of said shipments and bags or sacks in which the shipments were made at the time of delivery of said shipments to the carrier?" To which he replied, "In good commercial condition." This question and answer were each objected to, and the objec-tions being overruled, exceptions were noted, the same being the first and second bills of exceptions. He was then asked: "What was the weight of each of said shipments and by whom were said shipments weighed?" He replied: "The weights are shown on the invoice; they were weighed by myself and the owner of the wool in connection with the rail-road receiving clerk. I attach hereto a copy of both ship-ments as weighed and marked them P-1 and P-2." The question and answer were each objected to, and the objec-tions being overruled, exceptions were noted, the same being the third and fourth bills of exceptions.

The deposition of Wm. E. Voelkel, Jr., also taken at New Orleans, La., was next offered in evidence. He testified that he was the proprietor of the business conducted by the firm of Wm. E. Voelkel & Son, and the consignee named in the two bills of lading referred to in the deposition of Davis, and was also the Wm. E. Voelkel named in a bill of

lading dated June 12th, 1909, issued by the Morgans' Louisiana & Texas Railroad and Steamship Co., at Buma, Texas, wherein Lewis Baer & Co., of Baltimore, are named as consignees, for one hundred and one sacks of wool, and when asked "What was the condition of said shipments and the bags or sacks in which said shipments were made at the time of delivery of said shipments to the carrier," he replied: "In a good, merchantable condition. The shipment was compactly packed, the sacks thoroughly stitched and in good condition of strength for wear and tear." This question and answer were each objected to and the objections being overruled, exceptions were noted, the same being the fifth and sixth bills of exceptions.

The copies of shipments, referred to in Davis' testimony and marked Exhibits P-1 and P-2, were then offered in evidence. Objection was made to the admission of these exhibits, but the objection was overruled and exception noted, forming the seventh bill of exceptions.

Receipts to the terminal carrier for each shipment were then offered. These receipts showed the number of sacks and the date of delivery, July 7th, 1909, and were signed by the haulers, employees or the members of the firm of Lewis Baer & Co. The number of sacks receipted for corresponds with the number named in the bills of lading. Upon one of the receipts only was there a memorandum as to the condition of the sacks, and that was the receipt for the lot containing seventy-eight sacks. Upon this receipt was written: "Part of these bags in bad condition, 2 loose pkgs., 1 bag of 50 lbs., 1 bag 39 lbs."

The freight bills were also offered by the plaintiff in which the number of sacks appears as in the bills of lading. The weight of one of the shipments, differs from the weight mentioned in the bill of lading. In this one the weight is given as 10,000 lbs., while in the bill of lading the weight given is 9,234 lbs. This discrepancy, however, was fully and satisfactorily explained by showing that this enlarged weight was placed so as to get the benefit of carload rates,

10,000 lbs. being the minimum weight entitling the shipper to carload rates.

Hauhn and Booth, haulers, and Pierson, foreman for Lewis Baer & Co., and Moses Baer and Solomon Baer, members of the firm of Lewis Baer & Co., testified that they saw the wool in the scow of the New York and Baltimore Transportation Line before any of it was removed therefrom. They stated that the bags were torn and in bad condition, and that much of the wool was loose in the scow. That a full wagon load of loose wool was hauled from the scow to the store of the consignees, the number of pounds of loose wool being estimated by them from two to four thousand pounds. They also testified that in the scow were barrels of lime and that the wool was both upon and between the barrels and in removing the wool some of it was possibly left in the scow, because, as they stated, to get it all it was necessary to remove the barrels of lime. The scow and wool was in charge of a boy about sixteen years of age who was unknown to the witnesses for the plaintiffs.

The evidence further discloses that before any attempt was made to remove the wool from the scow, one of the members of the firm of Lewis Baer & Co. notified Frederick C. Moore, agent in Baltimore of the New York and Baltimore Transportation Line, of the condition of the bags and wool as it appeared in the scow, and informed Moore that it was impossible for the consignees, owing to the mixed condition of the wool, to separate it in the lots in which it had been shipped, and called upon him to separate it in order that the consignees might receipt separately for the three shipments, as required of them by the boy in charge of the scow. In reply to this notice and request, Mr. Moore told him to haul it all to the store and weigh the entire lot as one. This was done, the aggregate weight thereof being 22,932 lbs. The receipts appear to have been given separately for the three shipments, being signed by the haulers, employees and members of the firm of Lewis Baer & Co. It is not disclosed by whom the memorandum, to wit: "Part

of these bags in bad condition, 2 loose pkgs.," appearing upon one of the receipts, was written.   The next day after the delivery of the wool, Mr. Moore the agent referred to above, called at the store of the consignees and informed them that he had found more wool lying loose on the wharf of the transportation company, which, when gathered up, filled five bags or sacks.   This was sent for by the consignees and carried to their place of business, and there weighed and found to contain 346 lbs., making an aggregate of 23,278 lbs. of wool received by the consignees.

The plaintiff's then offered the depositions of Wm. H. Butler and John C. Giles, taken in New York by the defendants.   The former was the receiving clerk for the New York & Baltimore Transportation Line, stationed at Pier 10 East River, N. Y., and the latter was a checker for the Southern Pacific Company at its pier on North River, in New York. Butler's duty was to receive and supervise the receiving of freight and forwarding freight for the line by which he was employed, and Giles was employed to check in a book each shipment of freight as it came off the steamship of the Southern Pacific Company to the dock or pier in New York City.   Butler testified that he was present on July 3rd, 1909, when the lighter Jersey City, of the steamship El Alba, of the Southern Pacific Co., transferred, at Pier 10, East River, to the steamer Manahatta, of the New York and Baltimore Transportation Line, the three shipments of wool heretofore referred to, consigned to Lewis Baer, Baltimore, Md.   He testified that he observed the character or condition of the sacks containing the wool and said they were rather dirty and greasy, some of them were old and mended, but he did not notice any wool protruding from them during the course of loading or unloading them, and he did not see any holes in them.   He further testified that "there were no sweepings or loose wool from these shipments on the lighter or on the dock."

The testimony of George H. Dean, checker for the New York and Baltimore Transportation Line, offered by the defendant, is substantially the same as that of Butler.

Giles testified that he checked fifteen sacks of the lot of 112 sacks of wool as they were unloaded from the steamship El Alba; after that he was followed by another checker of the Southern Pacific Company, McElroy. He testified that it was his duty to examine each sack and see what its condition was and if it was torn or broken it was his duty to have it set aside and mended before it could be delivered by the Southern Pacific Company. There was no wool protruding or coming out of the fifteen sacks which he checked and there were no rips or tears in any of them.

McElroy, who testified for the defendants, said that he checked off and personally inspected the remaining 97 sacks of the lot of 112 sacks, also the shipments of 78 and 101 sacks. He said the sacks were second-hand, most of them greasy and dirty and many of them had been patched or mended, but he saw no wool protruding or extending out of the sacks; there was no loose wool or sweepings taken from the steamer El Alba on the day in question.

Lewis Baer when testifying for the plaintiffs, was asked: "How did the weights represented by the seller compare with the weights designated or stated on the bills of lading issued by the carrier for these shipments?" This question was objected to by the defendants; the Court, however, overruled the objection and exception was noted, making the ninth exception. The witness answered, saying: "They compared all right, sir; the bills of lading compared correctly."

The defendants by their first prayer asked the Court to instruct the jury that under the pleadings there is no evidence in this case legally sufficient to entitle the plaintiffs to recover. It is because of this prayer that we have so fully stated the evidence in this case.

To create the presumption of law that the shortage or loss of goods occurred on the lines of the terminal carrier, or while in its possession, it is necessary that the plaintiffs should show: (1) that the goods of the quantity named were delivered to the initial carrier; (2) that all of said goods were not delivered by the terminal carrier to them, the con-

signees. When these facts are shown, then the burden is upon the terminal carrier to show that the loss of goods did not occur upon its lines or while in its possession.

To prove the delivery of the quantities of wool to each of the initial carriers, the plaintiffs, apart from any other evidence appearing in the record as to the quantity of goods delivered to the initial carriers, offered in evidence the bills of lading in which each of the initial carriers acknowledges the receipt of the quantity of wool claimed by the plaintiffs to have been delivered to them respectively to be forwarded over the lines of the defendant companies.

"In so far as bills of lading acknowledge that the carrier has received the goods, or that he has received the quantity named, they are like all other receipts and may be shown to have been given by mistake and not to speak the truth. But it is said to be very high and authentic evidence of both the quantity and condition of goods when they were received." *Hutchinson on Carriers,* 1st vol., sec. 158. In this case, no effort has been made to disprove the accuracy or correctness of the weights given in the bills of lading.

We think that the evidence offered by the plaintiffs, establishes the quantity of wool delivered to the initial carrier and also shows a shortage in the quantity of wool delivered by the terminal carrier, the consignees. Therefore, the burden was upon the defendant, the terminal carrier, to show that such loss or shortage did not occur upon its lines or while in its possession.

In assuming this burden and to rebut this presumption, the deposition of W. A. Nelson, clerk in the employ of the Southern Pacific Company, in New Orleans, was offered in evidence; in it he testified that he checked from the cars of the Kansas City Southern Railway Company, in which they had been transported to New Orleans, the two shipments of wool, one of 78 sacks and the other of 112 sacks. In speaking of the lot of 112 sacks he said the car was on the switch upon the wharf of the Southern Pacific Company and alongside the ship. He was at and upon the car as the goods

came out. The sacks used "were second-hand, resewed, torn and contents exposed. One small sack, very slack, weight four pounds." He further testified that he saw no loose wool in the car; "if there was, it was very little, nothing much to speak of." The sacks were weak and all of them had more or less holes in them. In testifying as to the lot of seventy-eight sacks, he stated that he was in front of the car when the wool was checked out. The bags used were second-hand, with holes in them and some of the heads were open. Some of the bags had already been resewn. He also testified that they were checked as "second-hand bags, torn, resewed and contents exposed; heads open, about one-half sack of wood found on floor; some placed back in sacks." He further testified that he had the wharf cooper resew the sacks of both of these shipments and they were by him put in pretty fair condition, the best they could under the circumstances.

The defendants also offered the evidence of George R. Brown, an employee of the New York and Baltimore Transportation Line, at Baltimore, in charge of the inbound freight. He testified that he was present when the wool was transferred from the steamer to the scow, in which it was afterwards delivered to the consignees. The bags "looked in pretty good condition." but were second-hand bags and patched. That he was at the scow several times while the goods were being delivered; that there was no loose wool on the "ship or going from the ship to the scow"; there was no loose wool at all. In connection with this statement of the witness, that there was no loose wool, it will be recalled that the testimony of the plaintiffs was that at the request of Mr. Moore, agent of the terminal carrier, they sent for and got five additional bags of wool that Mr. Moore said was loose wool which he had gathered up around the wharf at which the steamship was lying, and this testimony was not contradicted by Mr. Moore when upon the stand.

The testimony so offered by the defendants was submitted to the jury for their consideration and it was with them to

88     N. Y. & BALT. TRANS. CO. vs. BAER.

Opinion of the Court.     [118

determine whether or not it met and overcame the presumption of law that the loss of goods occurred upon the lines of the terminal carrier or while in its possession.

In the case of *Merchants & Miners Transportation Co.* v. *Eichberg,* 109 Md. 225, which was a suit instituted by the appellees against the Merchants & Miners Transportation Co. and the Central of Georgia R. Co., as joint defendants, to recover for damages alleged to have been sustained by the plaintiffs through the negligence, improper conduct, lack of skill and care and wrongful action of the defendants and each of them in transporting a large quantity of wrapping paper and paper bags, etc., from Atlanta, Ga., to Baltimore, Md., the Court said: "We think the proceedings were properly brought in tort jointly against both carriers. 1 *Poe Pleading,* secs. 296, 526 and 528; *Mershon* v. *Hobensack,* 22 N. J. L. 380." Thus the objection urged by the appellants against this action, because jointly brought against the two defendants, is not well taken.

From what we have said, we think the Court committed no error in refusing to grant the defendant's first prayer, wherein it was asked to instruct the jury that there is no evidence in this case legally sufficient to entitle the plaintiff to recover. Nor do we think, from the facts of this case, that the Court committed any error in refusing to grant the defendants' fifth, sixth, seventh and eighth prayers. (These prayers together with the ninth prayer, the reporter will please insert in the statement of the case.)

In this case we find no legally sufficient evidence entitling the plaintiffs to recover against the Southern Pacific Railway Company, and for this reason, if for no other, the Court properly refused to grant the defendants' ninth prayer.

We think, however, the Court erred in granting plaintiffs' first prayer. In it the measure of damages was stated to be "the fair market value of the shortage of wool at the place of delivery, to wit, at Baltimore, Md., at or about the time of the delivery, with interest upon the amount found to

be due from July 7th, 1909, in the discretion of the jury. This is in conflict with the express stipulation found in the bill of lading, to wit: "The amount of any loss or damage for which any carrier is liable, shall be computed on the basis of the value of the property (being the *bona fide* invoice price, if any, to the consignee, including the freight charges, if prepaid) at the place and time of shipment under this bill of lading," etc. For this reason the judgment of the Court below will be reversed.

We find no serious objection to the ruling of the Court upon the first, second, fifth and sixth exceptions. We think the questions were proper ones, although the answer forming the second exception was not clear in its meaning.

The third, fourth and seventh exceptions will be considered together. The question involved in the third bill of exceptions is not objectionable. Nor is the answer forming the fourth bill of exceptions objectionable, wherein he answers the question by whom the wool was weighed. As to the admission of the copies of invoice as evidence of the weight of the wool, the same probably could have been made admissible and could have served the witness in testifying as to the weight of the wool, but with such facts only as are given in relation thereto, we think such copies are inadmissible as offered.

The eighth exception is to the two answers of the witness Solomon Baer, in which he testified that Johnson, the local freight agent of the Southern Pacific Company, spoke of the justness of the claim and the readiness of the company to pay it and explained why it had not been paid. As the record discloses, Johnson was merely the local freight agent of the company. It is not shown that he had the authority to pay, settle or even admit the payment of a claim owing by the company, or that he was permitted by the company to hold himself out as an agent having such authority, in fact Johnson subsequently testified that he did not have such

authority.  We therefore think this testimony was inadmissible.  *Hoffman* v. *Railway Co.*, 85 Md. 391.

As we have said the Exhibits P-1 and P-2, involved in the seventh exception, should not have been admitted, it follows that the evidence mentioned in the ninth exception was inadmissible.

We think the Court committed no error in its ruling upon the tenth exception.  It was proper for the defendant to show what may have been the natural shrinkage or drying out of the wool after shipment and before delivery, by reason of the provision in respect thereto contained in the bill of lading, but we do not think it was shown that the witness was sufficiently informed to enable him to testify as to this fact.

From what we have said, the judgment of the lower Court will be reversed.

*Judgment reversed and new trial awarded,*
*with costs to the appellant.*