**WIRTH LIMITED**

v.

**SS ACADIA FOREST and Lash Barge No. CG–204 et al.**

**HOESCH SIEGERLANDWERKE A. G. SIEGEN**

v.

**SS ACADIA FOREST and Lash Barge CG–204 et al.**

Civ. A. Nos. 71–3250, 72–2914.

United States District Court, E. D. Louisiana.

May 23, 1974.

·Henry J. Read, A. Gordon Grant, Jr., Montgomery, Barnett, Brown & Read, New Orleans, La., for plaintiffs.

Robert B. Acomb, Jr., John J. Broders, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendants.

MITCHELL, District Judge.

The issue of liability vel non of these consolidated cases was tried before this Court, sitting without a jury, on another day. For the purposes of this determination, the parties stipulated each plaintiff to be the proper party in interest. Defendant reserved the right to require proof as to the real parties in interest in the event of a judgment in favor of one or both plaintiffs on the liability issue.

The Court having heard oral argument and having considered the record, the briefs of the parties and the law applicable, now rules.

## FINDINGS OF FACT

### I.

Plaintiff, Wirth Limited, was at all times pertinent hereto a corporation or other legal entity, organized and existing pursuant to the laws of Canada, with its principal office and place of business located in Montreal, Canada.

### II.

Plaintiff, Hoesch Siegerlandwerke A. G. Siegen, was at all times pertinent hereto a corporation or other legal entity organized and existing pursuant to the laws of a foreign country.

### III.

Defendant, Eurogulf Lines, Inc. d/b/a Central Gulf Contramar Lines, was at all times pertinent hereto a corporation or other legal entity organized and existing pursuant to the laws of a foreign country, doing business within this Court's jurisdiction through its agents Central Gulf Steamship Corporation, and was at all pertinent times the operator of the *S/S Acadia Forest* and *Lash Barge CG–204*.

### IV.

A cargo shipment consisting of 113 bundles of iron plates was delivered by ALS Herman Ludwig to defendant in good order and condition at the Port of Bremen, located on the Weser River in West Germany, on or about November 25, 1970. The cargo was loaded aboard defendant's *Lash Barge CG–204* subsequent to which defendant issued a bill of lading [1] the possession of which was retained by defendant's foreign agents, Ivers and Alt.

### V.

On November 26, 1970, a cargo shipment consisting of 25 bundles of galvanized steel sheets and 25 coils of galvanized steel sheets was delivered by Carl Polzin to defendant in good order and condition at the Port of Brake, located on the Weser River in West Germany. A bill of lading [2] was issued and retained by defendant's agents, Ivers and Alt, after the cargo was loaded aboard defendant's *Lash Barge CG–204*.

### VI.

Lash barges operated by defendant are uniform in size. They are approximately 61.5 feet in length, 31.5 feet in

---

1. Plaintiff's Exhibit #1.

2. Ibid.

width, and 13 feet in depth. Unloaded, they weigh approximately 85 tons.[3]

## VII.

The *S/S Acadia Forest* is approximately 860 feet long, 108 feet in width, and has a dead weight of approximately 47,500 tons. She is equipped with a gantry crane that runs up and down the length of the vessel which crane is used to lift Lash barges onto her deck. She is capable of carrying 83 loaded barges.[4]

## VIII.

Lash barges are floating containers used to carry cargo from or to inland ports. The barges themselves are carried on board an ocean going mother vessel, such as the *S/S Acadia Forest*, which anchors at a deep water port from which anchorage Lash barges are dispensed either to deliver cargo to or collect it from inland ports via inland water ways. The barges have no self propulsion and must rely on towing vessels for mobility.

## IX.

On November 27, 1970, *Lash Barge CG–204* was the lead barge in a flotilla comprised of six Lash barges being towed from Brake, Germany, down the Weser River to Bremerhaven, Germany, anchorage of the *S/S Acadia Forest*.

## X.

The barges were made up end-to-end, or single file, and were towed by three tugs; the *Cito*, the *Hanseat II* and the *Gunther*, all operated by an independent towing company, whose services were arranged for by Ivers and Alt, defendant's foreign agents.

## XI.

The *Cito*, as lead tug, was connected to *Lash Barge CG–204* by a bridle and tow line. The *Hanseat II*, because of her greater steering ability and horsepower,[5] was the steering tug, and was made up to the starboard side of the last barge in the flotilla by three lines. A line ran forward from the starboard forward side of the *Hanseat II* to a bollard on the starboard forward end of the next to last barge in the flotilla. A spring line ran from the port forward side quarter of the *Hanseat II* to the after starboard bollard of the last barge in the flotilla. A line also ran from the port midship bollard of the *Hanseat II* to the after port quarter bollard of the last barge in the flotilla.[6]

The *Gunther* was secured to the port side of the last barge in the flotilla in a manner almost identical to the method used to secure the *Hanseat II*[7]

## XII.

In order to reach the *S/S Acadia Forest* it was necessary for the flotilla to navigate the Nordschleuse Lock on the Weser River at Bremerhaven. Approaching and entering the lock was an intricate maneuver because of an ebb tide that was in full flow at the time of the casualty.[8]

## XIII.

The approach to the lock by the flotilla, at half speed, was uneventful. Only when approximately one half of the flotilla (the *Cito* and approximately three Lash barges) had entered the fore port of the lock did the ebb tide come to bear, forcing the flotilla's bow to starboard and its stern to port. Kruse, aboard the *Hanseat II*, in an effort to counter the

---

3. Testimony of Dennis Hannan, formerly General Manager of the Lash Division for Central Gulf Steamship Corporation. Tr. pp. 36–37.

4. Hennau, p. 38.

5. Deposition of Mr. Reinhold Klaus Kruse, Master of the *Hanseat II* on November 27, 1970, and Master of the Lash flotilla.

6. Kruse deposition, p. 5.

7. Kruse deposition p. 6; Deposition of Mr. Werner Essman, Master of the *Gunther* on November 27, 1970, p. 2.

8. Deposition of Mr. Paul-Otto Erdmann, Inland water caft pilot for the lower Weser River; p. 28; Kruse, p. 7.

drifting movement, gave 30°–35° port rudder and ordered engines full ahead. On execution of this maneuver the line running from the port midships bollard of the *Hanseat II* to the after port quarter bollard of the last barge in the flotilla, snapped. The *Cito* and the *Gunther*, realizing that an emergency situation existed, took independent action.

### XIV.

The *Cito* towed to port and the *Gunther* went full astern. Nevertheless, the flotilla's bow continued to swing to starboard, eventually causing the starboard forward corner of the *Lash Barge CG–204* to strike the lock's east side fore port wall. The single-shell, *Lash Barge CG–204* began taking on water and eventually sank, resulting in the damage to plaintiffs' cargo.

## CONCLUSIONS OF LAW

### I.

The Court has jurisdiction over this Admiralty matter, and venue is proper.[9]

### II.

█ In order for plaintiffs to establish a prima facie case in a claim for cargo damage, they must prove that the cargo was delivered to the defendant in good order, and that it either was not received or was received in a damaged condition. The burden of explanation and exoneration from fault is thereafter on the defendant carrier.[10]

Plaintiffs and defendant have stipulated the cargo's good condition when delivered to defendant.[11] That the cargo was damaged while in the exclusive possession of defendant and/or its agents is uncontested.

### III.

█ Defendant seeks exoneration from plaintiffs' claim based on the statutory defenses embodied in the Carriage of Goods by Sea Act[12] (hereinafter referred to as Cogsa). Cogsa was specifically incorporated into the bills of lading prepared by defendant's foreign agents, Ivers and Alt, when plaintiffs' cargo was loaded onto *Lash Barge CG–204*.[13] Although the bills of lading were not actually issued to plaintiffs, we conclusively find that the cargo was in defendant's possession, that the cargo was shipped pursuant to those documents and, further, that the rights and liabilities of the parties must be decided on the terms of carriage set forth therein.[14]

### IV.

█ Where a statute is incorporated by reference into a bill of lading, the

9. 28 U.S.C. § 1333.

10. Flota Mercante Del Estado v. Orient Ins. Co., 198 F.2d 740 (CA5–1952); Schnell v. The Vallescura, 70 F.2d 261 (CA2–1934); Copco Steel and Engineering Co. v. The Prins Willem Van Organje, 159 F.Supp. 79 (ED Mich–1957); Schroeder Bros., Inc. v. The Saturnia, 123 F.Supp. 282 (SD NY–1954), aff'd. 226 F.2d 147 (CA2–1955).

11. Plaintiffs' Exhibit # 1.

12. 46 U.S.C. § 1300 et seq.

13. "General Vessel-Conditions of Carriage", provision "2. Law Governing and Period of Responsibility", part (b) provides in pertinent part ". . . that this Bill of Lading shall have effect subject to the provisions of the United States Carriage of Goods by Sea Act . . . or to the Hauge Rules . . . which shall govern throughout the entire time the goods are in the carrier's

custody, including periods of the carrier's actual custody, if any, before the goods are loaded on the vessel . . ." Additionally, "Lash Barge-Conditions of Carriage" provision 3(c) provides in pertinent part that ". . . the United States Carriage of Goods by Sea Act . . . or . . . the Hauge Rules . . . shall govern throughout the entire time the goods are in the carrier's custody, including periods of the carrier's actual custody, if any before the goods are loaded on the barge and after discharge therefrom . . ."

14. "While the giving of such documents (bills of lading) is important evidence that the custody of the goods have been taken by the carrier it is neither essential nor conclusive provided in fact the shipment has been delivered and accepted by the carrier." The Yoro, 2 Cir., 197 F.2d 241, 1952 AMC 1094; cf. Benedict on Admiralty, § 92, 6th Ed. p. 284.

terms of the statute become terms of the bill of lading and the Court has a duty to construe the entire contract to give consistent effect, if possible, to all of the terms. The contract clauses must be read together and harmonized whenever reasonably possible.[15]

### V.

Defendant asserts the Cogsa defense of negligent navigation by its agent, the master of the *Hanseat II*, claiming the accident to have been caused by Captain Kruse navigating the flotilla too closely to the Nordschleuse Lock.[16] Defendant avers that this fact, when combined with the action of Captain Kruse in ordering full ahead, 30°–35° port rudder when the flotilla was caught up in the ebb tide, constitutes negligence. Captain Kruse stated that the line which eventually broke was slack before he executed port rudder,[17] this manuever, claims the defendant, caused the slack line to suddenly become taut and break.[18]

### VI.

■ Cogsa was intended to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers involved in international trade.[19] It was an almost verbatim incorporation of the Hague Rules of 1921, as amended by the Brussels Convention of 1924.[20] Cogsa provides that every bill of lading evidencing a contract for the carriage of goods by sea to or from ports of the United States in foreign trade is subject to the provisions of the Act.[21]

The term "carriage of goods" covers the period from the time when the goods are loaded on, to the time when they are discharged from, the ship.[22] The term "ship" means any vessel used for the carriage of goods by sea.[23] The term "foreign trade" means the transportation of goods between ports of the United States and ports of foreign countries.[24]

### VII.

■ The statutory defenses of Cogsa, more particularly the defense of negligent navigation, are applicable only to cargo-carrying ships engaged in foreign trade. It is crucial therefore whether we characterize the *Lash Barge CG–204* as a ship for purposes of Cogsa or simply as a barge or lighter; a semantical but pivotal determination.

### VIII.

■ Contracts such as bills of lading are to be interpreted from the language within the four corners of the documents. An expression of intent is most reliably captured in a written agreement.[25] If there exists ambiguous language in bills of lading the law holds that it is best resolved against the one who has prepared it.[26] Based on the

15. Empacadora Puertorriquena De Carnes v. Alterman Transport Line, Inc., 303 F.Supp. 474 (D Puerto Rico–1969) ; Pannell v. United States Lines Co., 263 F.2d 497 (CA2–1959).

16. 46 U.S.C. § 1304(2) "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from (a) Act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship ;".

17. Kruse deposition, p. 14.

18. On this point defendant refers to the opinion of its expert, Captain Werner Voss, offered through deposition, who neither witnessed the accident nor inspected the broken line before or after the accident, for the proposition that slackness in the line combined with the *Hanseat II's* sudden maneuver of full ahead, 30°–35° port rudder snapped the line.

19. Robert C. Herd and Co. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959).

20. Herd, id., at p. 301.

21. 46 U.S.C. § 1300.

22. 46 U.S.C. § 1301(e).

23. 46 U.S.C. § 1301(d).

24. 46 U.S.C. § 1312.

25. Insurance Company of North America v. Bosworth Construction Co., 469 F.2d 1266 (CA5–1972).

26. Mamiye Bros. v. Barber Steamship Lines, Inc., 241 F.Supp. 99 (SD NY–1965), and cases cited therein.

bills of lading admitted into evidence and the legal guidelines set out above, we find the intent of the parties to have been and we therefore hold that "general vessels" and not "Lash barges" were to be ships as defined by Cogsa.

## IX.

▮ Lash operations necessarily involve the carriage of cargo by two separate vessels: Lash barges used for inland waterway carriages; and general vessels used for the ocean carriage of cargo laden Lash barges. Defendant's bills of lading exemplify this obvious fact by dichotomizing its conditions of carriage into terms made applicable to the "General Vessel" and to terms applicable strictly to "Lash Barges".[27]

The conditions of carriage made applicable to the General Vessel states explicitly that liability commences " . . . in no event . . . before the goods have been loaded over the *ship's* rail and shall cease when goods have passed *ship's* rail upon discharge" (emphasis supplied). The same provision in the conditions of carriage made applicable to Lash barges substitutes the word "barge" for "ship". That different vessels were intended and enumerated is obvious.

Furthermore, and conclusively erasing any doubt as to carrier's intent of differentiating the nature and usage of its vessels, is the following language quoted from the carriage conditions applicable to Lash Barges.

> "1. After the loading of the goods into/on the barge will be towed/pushed to the rendezvous point where the barge and its contents will be loaded on the *ocean vessel* named herein . . ." (emphasis supplied).

The meaning "ocean vessel", as envisioned by this Court, means any vessel used for the carriage of goods by sea, in other words, a "ship" as defined by Cogsa.

## X.

This is not to say, however, that parties may not contract by bills of lading to designate as "ships" Lash barges engaged in cargo carriage on inland waterways, thus extending to them the provisions of Cogsa. Cogsa allows a carrier to alter its responsibilities to a shipper by unilaterally or jointly extending the applicability of the Act to situations not otherwise covered.[28] For example, judicial consent has permitted parties to make the terms of Cogsa applicable to the carriage of goods between ports of the United States or its possessions, a carriage otherwise excluded from the Act;[29] parties may also contract the applicability of Cogsa to coastwise commerce between foreign ports.[30]

## XI.

In the absence of specific language to the contrary in the bills of lading, we are bound to hold that *Lash Barge CG-204*, whose Certificate of Registry lists her in the class of barges classified for river, bay and sound service,[31] was not a "ship" as intended by Cogsa, and defendant is not entitled to a defense of negligent navigation.

## XII.

The inability to assert this defense leaves defendant with the burden of proving freedom from fault.[32]

The owner of a vessel warrants the seaworthiness of that vessel when it is delivered for the intended voyage.[33] A contract to carry cargo aboard a barge

27. Plaintiff's Exhibit #1.

28. 46 U.S.C. § 1305.

29. 46 U.S.C. § 1312, Commonwealth of Puerto Rico v. Sea Land Services, Inc., 349 F. Supp. 964 (D Puerto Rico–1970).

30. Petition of Isbrandtsen, 201 F.2d 281 (CA2–1953). Cargo shipped from Germany to Korea under a bill of lading incorporating Cogsa limitation clause.

31. Defendant's Exhibit # 1.

32. Fn. 2, *supra*.

33. Petition of Reliance Marine Transportation and Construction Corp., 206 F.2d 240 (CA2–1953) ; Interlake Iron Corp. v. Gartland S. S. Co., 121 F.2d 267 (CA6–1941), cert. denied 314 U.S. 681, 62 S.Ct. 181, 86 L.Ed. 545 (1941).

carries with it a warranty of seaworthiness,[34] which implies that the vessel and its appurtenances are reasonably fit for carrying cargo.[35]

 The unexplained snapping of a cable, totally within control of defendant's agents critical to the safe steerage of a flotilla, we think, in the complete absence of evidence to the contrary constitutes unseaworthiness.[36] In any event, it raises a presumption of negligence [37] which defendant has failed to rebut. As the Court noted in the Rose Goldrick case,

> "Ordinarily lines in proper condition, properly fastened do not slip or part and the fact that they did so without satisfactory evidence as to the manner in which they were made fast and without any evidence as to the condition of the lines, leads the Court to hold that the fact that they slipped and parted is prima facie evidence of the negligence on the part of the barges either in making fast the lines, or in using defective lines." at 1562.

The sole evidence as to the condition of the cable which parted, prior to the collision, was a statement that all the cables " . . . were fairly new items." [38] To the same effect was the statement of Captain Gerhard Schumacher, master of the *Cito*,[39] who saw the broken cable after the accident, that the " . . . wire was good. It was a bright wire." [40] This alone is insufficient. We hold that plaintiff's have established a prima facie case of cargo damage, left unrebutted by defendants.

### XIII.

 The unseaworthiness of the *Lash Barge CG–204* for which the defendant has not been exempted by statute and to which claim the defendant has failed to meet its burden of proof requires our dismissal of defendant's counterclaim for general average.[41]

For the foregoing reasons, it is ordered that Judgment be entered decreeing that plaintiffs, Wirth Limited and Hoesch Siegerlandwerke A. G. Siegen, recover their provable damages from defendant, Eurogulf Lines, Inc., d/b/a Central Gulf Contramar Lines.

It is further ordered that defendant's counterclaim for general average be dismissed.

---

34. Derby Co. v. A. L. Mechling Barge Lines, Inc., 258 F.Supp. 206 (ED La–1966) affirmed 399 F.2d 304 (CA5–1968).

35. Calf. & Hawaiian Sugar Refining Corp. v. Winco Tankers, Inc., 278 F.Supp. 648 (ED La–1968).

36. Were we to classify the *Lash Barge CG–204* as a "ship", defendant could exonerate itself from liability by showing due diligence to make the ship seaworthy. 46 U.S.C. § 1303(1) provides "The carrier shall be bound, before and at the beginning of the voyage to exercise due diligence to—(a) Make the ship seaworthy;".

37. Rose Goldrick v. Connell Steamboat Company, Inc., et al., 1934 AMC 1562.

38. Kruse deposition, p. 6.

39. Schumacher deposition, p. 9.

40. Id, p. 15.

41. The Louise, 58 F.Supp. 445 (DMd–1945); Cia Atlantica Pacifica, S. A. v. Humble Oil & Refining Company, 274 F.Supp. 884 (DMd–1967).