ORIENT OVERSEAS LINE ET AL. *v.* GLOBEMASTER
BALTIMORE, INC. ET AL.

[No. 437, September Term, 1975.]

*Decided November 1, 1976.*

The cause was argued before THOMPSON, MOYLAN, POWERS and MOORE, JJ.

*Richard R. Jackson, Jr.,* and *John C. Baldwin,* with whom were *Ober, Grimes & Shriver* on the brief, for appellants Orient Overseas Line and Overseas Maritime Company.

*Howard G. Goldberg,* with whom were *Phillips L. Goldsborough, III,* and *Smith, Somerville & Case* on the brief, for appellant — cross-appellee John T. Clark & Son of Maryland, Inc.

*David W. Skeen,* with whom were *John H. Skeen, Jr.,* and *Skeen & Roach* on the brief, for appellees — cross-appellant Globemaster Baltimore, Inc.

*Francis J. Gorman,* with whom were *Semmes, Bowen & Semmes* on the brief, for appellee The Cottman Company.

MOYLAN, J., delivered the opinion of the Court.

Globemaster Baltimore, Inc. (Globemaster), consignee of cargo listed in two ocean bills of lading and assignee of cargo

listed in four others, filed a suit in the Superior Court of Baltimore City against Orient Overseas Line and Overseas Maritime Company (Overseas), owners and operators of the *S.S. Hongkong Merchant (Merchant)* and the *S.S. Hongkong Mariner (Mariner)*; John T. Clark & Son of Maryland, Inc. (Clark), discharging stevedore; and the Cottman Company (Cottman), the operator of a terminal at Pier 8, Canton Railroad, seeking damages for shortages in the cargo, consisting of handtools, shipped on Overseas' two ocean-plying vessels from Kobe, Japan, to the Port of Baltimore. Overseas, in turn, filed cross-claims against Clark and Cottman seeking indemnity. After a three-day non-jury trial, Judge Solomon Liss issued an oral opinion on March 14, 1975, finding all three defendants failed to use reasonable care in the handling of the cargo and entered a verdict in favor of Globemaster in the amount of $16,795.02, representing the value of the lost cargo and a proportionate share of the shipping costs and brokerage charges. Judge Liss, however, denied certain other items of damages claimed by Globemaster, including a $5,000 pre-judgment interest claim. Judge Liss also denied Overseas' cross-claims for indemnity against Clark and Cottman, holding that "each of the defendants had been negligent in the handling of the cargo and that, therefore, they were not entitled to recover against each other." The defendants were held jointly and severally liable under Maryland law, with no apportionment of damages based on degrees of negligence. Overseas and Clark appeal the judgments entered against them. Overseas also appeals the denial of its cross-claims. Globemaster appeals on the issue of damages. Cottman has filed no appeal.

In May of 1970, Globemaster entered into a contract with Overseas, through six ocean bills of lading issued in Japan, to have shipped, from Japan to Baltimore, 10,888 cardboard cartons of handtools. The first shipment of 7,316 cartons was loaded aboard the *Merchant,* which arrived at Pier 8 in the Lower Canton section of the Port of Baltimore on June 26, 1970. The cargo was discharged immediately and the ship resumed her voyage. Several weeks later, the *Mariner* arrived with the remaining 3,572 cartons. The cargo was

discharged on July 15, 1970, and the ship departed immediately. Both vessels had made stops at other ports before arriving in Baltimore. Longshoremen in those ports, while discharging other cargo, had worked in the same holds where the Globemaster cargo was stored. There was no partition separating the Globemaster cargo from other cargo.

The Mate's Receipts for the *Merchant*, which were prepared by a member of the crew of the *Merchant* at the time the cargo was loaded aboard to check the number of cartons and their condition, contain either the partially handwritten and partially stamped notation in the exceptions portion: "Ship's N/R (not responsible) for cover torn, loss, shortage and/or Condition of Contents" or the stamped notation: "Ship N/R for breakage and/or condition of contents." The several receipts for the *Mariner* which were introduced into evidence contain no notation in the exceptions portion. Overseas sought to explain that the notations were general disclaimers of responsibility for the contents and the sufficiency of the packaging to withstand normal handling and did not admit any shortage or damage to the inside of the cartons. Clean bills of lading, containing no notations or disclaimers as to shortage, were issued by Overseas on both shipments.

Overseas' local agent in Baltimore, Thor Eckert Maritime Agencies, Inc. (Eckert), retained Cottman, which operated a transit shed at Pier 8, to perform terminal operations for Overseas' vessels and their cargoes. Eckert paid Cottman a dockage charge which permitted the vessels to tie up at the pier and a wharfage charge which permitted the cargo to be unloaded onto the pier and remain warehoused within the transit shed for five days following a discharge, after which time Cottman received demurrage charges from the cargo receiver, Globemaster, for pier storage and retained a lien on the goods until the charges were paid.

Eckert also retained Clark to perform the stevedoring services on the two shipments, which entailed unloading the cargo, tallying it, and then placing it within Cottman's shed.

Longshoremen employed by Clark unloaded the cartons of handtools from the *Merchant* and the *Mariner* on June 26, 1970, and July 15, 1970, respectively. On each occasion, the cartons were stacked by the longshoremen on pallets, or drafts, removed from the vessel and placed on the pier apron adjacent to the vessel for checking by "checkers" or "tallymen" employed by Clark. The checkers were to tally the cargo and take exception to any damage or shortage in the cargo before the longshoremen placed the cargo in Cottman's shed.

Based on freight lists, or "manifests," which Overseas had forwarded to Eckert of all cargo aboard the vessels, Eckert had prepared Tally Records for use by Clark in checking the cargo upon arrival. These records contained the name of the vessel and its arrival date. They also identified the Globemaster cargo by bill of lading, commodity, markings, number of cartons and weight. Clark's checkers indicated the number of cartons removed from the vessels on "ditto sheets," which were copies of the freight lists or "manifests," and the sections in Cottman's shed where these cartons were placed. These notations were then transferred in Clark's office to the official Tally Records. The testimony revealed, however, that Clark's count was actually an estimate rather than an actual count. Because union rules prohibited the checkers from handling the cargo, they had to rely on a visual estimate of the number of cartons on a pallet. Thomas E. Hughes, one of Clark's checkers, testified that, from an external inspection, a checker can only see approximately 44 of the 64 cartons on an average draft. No exceptions were, furthermore, taken on the Tally Records as to the condition and number of cartons of Globemaster cargo removed from the vessels. A copy of the completed Tally Records was forwarded to Eckert and to Cottman. Eckert would have transferred any notations on the Tally Records to the freight lists. The only notations that appear on the freight lists as to the Globemaster cargo are "Nil" and "All acc for." Cottman made no independent tally or inspection of the cargo when it was unloaded from the vessels and stored in the transit shed.

Edward Yealdhall was the pier superintendent for Cottman in 1970, at the time the Globemaster cargo arrived. He was present when the cargo was discharged from both the *Merchant* and the *Mariner* and stored in the transit shed. He testified that when the *Merchant* arrived, the cargo that was unloaded was in "very bad order" with loose tools lying in the middle of the pallets. Yealdhall testified that he went on board the *Merchant* to see if the cargo was being handled and stored properly. There he saw loose tools and broken cartons in the hatch. Other cargo had been stored on top of the Globemaster cargo. Yealdhall stated that when the pallet-loads of cardboard cartons were stacked three or four high on the pier, more cartons fell and broke open. As a result, Yealdhall testified that he complained to "Sailor," Edward Wos, Clark's stevedoring superintendent. "Sailor" told him to get in touch with Steven Byan, who was then the Vice-President of Clark. Yealdhall stated, however, that even after he reached Steven Byan, nothing was ever done to remedy the situation. When the *Mariner* arrived, the cargo was in the same condition. Yealdhall testified that he again complained to his superiors.

Yealdhall described the Cottman shed as a long, enclosed shed, approximately 500 by 130 or 140 feet, with three doors on the west or land side and a big opening at the head of the pier for trucks to enter and exit. The east side was the loading side, and the west side was the delivery side. His office was on the northwest side of the pier. The shed was not partitioned on the inside with the exception of a galvanized wire cage, approximately 75 by 150 feet at the south side of the pier for securing "hot" or highly pilferable cargo. The cage had a lock on its only entrance and was covered on the top with barbed wire. It was in this cage that Yealdhall testified he placed some of the very badly broken cartons for safekeeping. Other broken cartons, however, were not placed in the cage until the truckers, who arrived on numerous occasions sometime later to pick up the cargo, rejected the broken cartons.

The cargo from the *Merchant,* which was discharged on June 26, was picked up intermittently from July 9 through

July 20. The cargo from the *Mariner*, which was discharged on July 15, was picked up intermittently from July 22 through August 5. During this time, 10,190 of the 10,888 cartons shipped were picked up for Globemaster by Phillips Brothers Trucking Company. The remaining cartons were either rejected by the truckers or were missing. Between August 14 and August 24, Globemaster submitted formal written claims to Overseas based on shortages in the cargo of the two vessels.

Sanford Disney, the Assistant Vice-President of Cottman in charge of terminal operations, testified that 698 cartons of the Globemaster cargo were either rejected by the truckers or were found missing. When a final pickup was made of these cartons from Cottman's security cage on September 30, 1970, 398 cartons were picked up, 65 of which were entirely empty; 300 cartons were missing completely. Disney testified that the Globemaster cargo he saw in the "cage," as is true of much cargo from the Orient, was "flimsily" packed and that he had contacted the vessels' agent, Eckert, and notified Eckert of the poor condition of the cargo. Disney testified that, as a general practice, Cottman does not count cargo being unloaded from a ship, that this would entail duplicating the efforts of the longshoremen. Instead, Cottman relied on the longshoremen's tally and on the figures furnished it by the steamship company. A count of the Globemaster cargo was made, however, by Cottman's checkers when the truckers arrived.

Gerhard Widderich, who was the manager for Eckert in June and July, 1970, testified that no exceptions were taken on the tally records as to the Globemaster cargo. Nor did the mates on the ships, who would normally call him when there was some trouble with cargo, do so in this case. Not until July 28, in a telephone call from Cottman, did Widderich learn of the damage to the Globemaster cargo. He then went down to the pier and looked at the cargo. He saw loose tools on the ground and cartons ripped open. As a result, he ordered an independent survey by the firm of Edward F. Carter & Associates, Inc. Widderich testified that had Eckert known sooner that the cargo was damaged on the

vessels, it would have attempted to recooper. He admitted, however, that in June and July, 1970, Eckert was partly owned by Clark and was, in fact, located in the same downtown Baltimore offices. Steven Byan, then Vice-President of Clark, was, in fact, Executive Vice-President of Eckert.

Edward H. Mester, the Vice-President and Secretary of the Cottman Company, reiterated that the terminal operator does not count palletized cargo at the time of the unloading because of the expense involved but that a count is made when delivery takes place to either trailers or to trucks. He said that it is the stevedores' responsibility to inform the ship if they find damaged cargo in the ship. He stated that it is the responsibility of the terminal operator to maintain a safe and reasonable place of storage. If cargo comes off a ship in torn cartons, the terminal operator will notify the stevedores so that they can recooper the cargo. If the cartons that need retaping are few, however, the terminal operator will many times do it himself. If there are many cartons that need retaping, however, it is, he testified, the ultimate responsibility of the shipper. The stevedores recooper at their own expense, however, where the cargo is damaged while being discharged.

Mester testified that several days after the discharge of the cargo from the *Merchant* he received a phone call from Yealdhall informing him of the damaged condition of the cargo unloaded from the ship. He told Yealdhall to contact Clark to recooper the cargo. He testified, however, that Clark did nothing about the situation. As a result of the phone call from Yealdhall, Mester personally went down to the pier to inspect the cargo. He testified that although a majority of the cartons were in good condition, a considerable amount, however, was not. He had already previously instructed Yealdhall, he testified, to put the damaged cartons in the cage. He took photographs, which were introduced into evidence, of these damaged cartons in the cage. Mester saw similar cartons outside the cage. There were broken and loose cartons in the middle of pallets. As a result, he told Yealdhall to put the balance of the damaged

cartons in the cage. He could only speculate that this was not done in the first place because many of the broken cartons must have been surrounded by other good cargo and, therefore, were difficult to reach. He did not initiate a survey of the cargo, however, nor did he call the Customs Service to investigate whether or not there was a theft of any of the cargo. Other than the phone calls to Clark, Mester testified that, to his knowledge, no written complaint was made to Clark.

Thomas E. Hughes, who was relief clerk for Clark (relieving the checkers for brief periods of time) on the day the cargo from the *Merchant* was discharged, testified that the two or three last drafts of Globemaster cargo contained loose handtools in the centers. He testified, however, that the damage was slight. He stated that no exceptions were taken, furthermore, because the damage "wasn't that bad." When asked by the court whether the photographs taken by Mester of the cartons in the cage were a fair representation of the condition of some of the cartons that came out of the ship, he answered, "No" — none of the cartons that came off the ship looked that way. He testified that had the cartons been in that condition Eckert would have been notified immediately and a survey initiated. He stated that the ship personnel saw the unloading of the ships. If the cartons had been in that condition, the ship personnel would have seen them.

Steven Byan, then Vice-President of Clark, testified that, from what he could recall in visits to the *Merchant* and the *Mariner*, most of the cargo was in generally good condition. He testified that his ship foreman called him when the *Merchant* arrived and told him that "Things are in a hell of a mess." He said, however, that when he saw the cargo, it wasn't "in a hell of a mess." Although there was some minor damage, it was not enough to warrant calling a surveyor or instructing the Cottman Company or notifying Globemaster or its agent. He testified, however, that exceptions should have been taken to the cargo.

Since Cottman has not appealed from the judgment below, its liability to Globemaster is not contested here. Only the

judgments holding Overseas and Clark also liable to Globemaster are in issue. In deciding whether the trial court was correct in its judgment, we must look at all of the court's factual findings, unless clearly erroneous, in the light of the applicable law.

As to Overseas and Clark, federal substantive maritime law governs. Globemaster's claims against Overseas were based upon the six ocean bills of lading. The bill of lading serves as a contract of carriage between a cargo shipper and an ocean carrier and, therefore, being maritime in nature, falls within the admiralty jurisdiction of the United States district courts, conferred by the Judiciary Article of the Constitution, U.S.C. Const. Art. III, § 2, Cl. 1, and by the provisions of § 9 of the Judiciary Act of 1789, 1 Stat. 76-77, 28 U.S.C., § 1333. *David Crystal, Inc. v. Cunard S.S. Co.*, 223 F. Supp. 273, 284 (S.D.N.Y. 1963), aff'd. 339 F. 2d 295 (2nd Cir. 1964); *Eutectic Corp. v. M/V Gudmundra*, 367 F. Supp. 681, 685 (S.D.N.Y. 1973). Globemaster's claims against Clark for negligence in the discharge of the cargo are also clearly within admiralty jurisdiction. See *Herd & Co. v. Krawill Machinery Corp.*, 359 U. S. 297, 79 S. Ct. 766, 3 L.Ed.2d 820. If an action which is cognizable in admiralty is brought in a state court under the "saving to suitors" clause, 28 U.S.C., § 1333 (1),[1] the state must apply substantive maritime law.

---

1. This "saving to suitors" clause limits what might otherwise appear to be the exclusive, original jurisdiction of the federal district courts:

"The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

(1) Any civil case of admiralty or maritime jurisdiction, *saving to suitors in all cases all other remedies to which they are otherwise entitled.*" (The "saving to suitors" clause is underlined.)

Instructive as to the purpose and the functioning of this saving clause is 2 C.J.S., *Admiralty*, § 13, "Saving of Remedies to Suitors," pp. 104-105:

"The 'saving to suitors' clause excepts from the exclusive maritime jurisdiction of the federal courts all cases in which suit may be brought to obtain other than admiralty remedies to which suitors are otherwise entitled."

. . .

"The remedies which the clause saves to suitors include common law actions and all means other than proceedings in admiralty which may be employed to enforce the right or to redress the injury involved . . . ."

*Kermarec v. Compagnie Generale Transatlantique*, 358 U. S.
625, 628, 79 S. Ct. 406, 3 L.Ed.2d 550; *Pope & Talbot, Inc. v.
Hawn*, 346 U. S. 406, 409, 74 S. Ct. 202, 98 L. Ed. 143; *Farrell
Lines, Inc. v. Devline*, 211 Md. 404, 415; *Frazier v. Waterman
S.S. Corp.*, 206 Md. 434, 448; *Pine Street Trading Corp. v.
Farrell Lines, Inc.*, 278 Md. 363 (1976).

### Globemaster v. Overseas

Overseas's obligation in relation to the care, custody, and
discharge of the cargo "from the time when the goods [were]
loaded on to the time when they [were] discharged from the
ship" was governed by the provisions of the Carriage of
Goods by Sea Act (COGSA), 46 U.S.C. §§ 1300 *et seq.*[2] 46
U.S.C. § 1301 (e). Under the provisions of this act, Overseas
was obligated to "properly and carefully load, handle, stow,
carry, keep, care for, and discharge the goods carried." 46
U.S.C. § 1303 (2). Upon arrival of the vessels at the
contractual port of delivery, Overseas was obligated to effect
"proper delivery" under the provisions of the Harter Act, 46
U.S.C. §§ 190 *et seq.*[3] "Proper delivery" within the

--------

"The saving clause is remedial, and was inserted in order to
make it clear that the grant of judicial power in the United States
in all cases of admiralty did not deprive the suitor of his com-
mon-law remedies."

The uncontested case law has held that under the provisions of this clause,
a suitor asserting an *in personam* admiralty claim may elect to sue in a
"common law" state court through an ordinary civil action rather than in
federal court under the admiralty jurisdiction. *Red Cross Line v. Atlantic
Fruit Co.*, 44 S. Ct. 274, 264 U. S. 109, 68 L. Ed. 582; *Chappell v. Bradshaw*, 9
S. Ct. 40, 128 U. S. 132, 32 L. Ed. 369; *Paduano v. Yamashita Kisen
Kabushiki Kaisha*, 221 F. 2d 615; *Wunderlich v. Netherlands Ins. Co.*, 125 F.
Supp. 877.

2. The enacting clause of COGSA provides that it shall apply to "every
bill of lading or similar document of title which is evidence of a contract for
the carriage of goods by sea to or from ports of the United States, in foreign
trade . . ."

For a full discussion and analysis of the history and provisions of the act,
see G. Gilmore & C. Black, *The Law of Admiralty*, 139-192 (2d ed. 1975).

3. Under the common law, a vessel owner engaged in common carriage of
cargo was an insurer of the cargo against all loss or damage except that
resulting from act of God and the public enemy, an inherent defect in the
goods carried, or a fault of the shipper. Fire was added to the list by statute
in 1851 so long as it was not due to the shipowner's negligence or design. As
such, the vessel could not lawfully exempt itself from liability for its
negligence or that of its servants. Nevertheless, carriers inserted various
clauses in their bills of lading restricting their liability. In some
jurisdictions these clauses (including exculpatory negligence clauses) were

provisions of this act means either actual or constructive delivery. Actual delivery consists in completely transferring the possession and control of goods from the vessel to the consignee or his agent. Constructive delivery occurs where the goods are discharged from the ship upon a fit wharf and the consignee receives due and reasonable notice that the goods have been discharged and has a reasonable opportunity to remove the goods or put them under proper care and custody. *J. Kinderman and Sons v. Nippon Yusen Kaisha Lines,* 322 F. Supp. 939 (E.D. Pa. 1971); *National Packaging Corp. v. Nippon Yusen Kaisha,* 354 F. Supp. 986 (N.D. Cal. 1972). Upon "proper delivery" the Harter Act ceases to govern the relationship between the parties, and a sea carrier's strict liability, as such, terminates. *Calcot, Ltd. v. Isbrandtsen Co.,* 318 F. 2d 669, 673 (1st Cir. 1963). See also *Pine Street Trading Corp. v. Farrell Lines, Inc., supra.* Thereafter, the carrier's responsibilities are those of a bailee or warehouseman to take ordinary care of the property and not to abandon it or negligently expose it to injury. *Consolidated Cork Corp. v. Jugoslavenska Linijska Plovidba,* 318 F. Supp. 1209 (S.D.N.Y. 1970); *Louis Furth, Inc. v. S.S. Srbija,* 330 F. Supp. 305 (S.D.N.Y. 1970); H. Longley, *Common Carriage of Cargo,* § 11.09, at 100 (1967).

Although under the Harter Act, the carrier cannot, by the terms of its bill of lading, terminate all responsibility for the cargo upon discharge before "proper delivery," the shipper and the carrier, however, may stipulate in their bills of lading that the carrier may fulfill its strict responsibilities

---

enforced while in others they were not. The Harter Act of 1893 was passed in an attempt to prevent the carriers from avoiding their common-law responsibilities by the inclusion of these exculpatory clauses while at the same time securing to carriers statutory exemption from liability for certain losses. What the Harter Act did, however, was to secure very little additional benefit beyond that which the cargo interests already had under the common law while it exempted a carrier from liability for the negligence of its servants where the carrier exercised due diligence to make the vessel seaworthy in all respects. As a result of dissatisfaction with the Harter Act, COGSA was passed in 1936. It has largely supplanted the provisions of the Harter Act. The Harter Act still applies, however, to the period before cargo is loaded aboard a vessel for travel in foreign trade and to the period after discharge of the cargo until its "proper delivery." H. Longley, *Common Carriage of Cargo,* §§ 1.01-1.06, at 1-5 (1967); Villareal, *Carrier's Responsibility to Cargo and Cargo's to Carrier,* 45 Tulane L. Rev. 770, 773-774 (1971); 70 Am.Jur.2d, *Shipping,* § 519.

as carrier upon delivery of the cargo from the ship's tackle onto the pier. See W. Poor, *Charter Parties and Ocean Bills of Lading*, § 61, at 142 (5th ed. 1968) and 1974 Supplement, § 61, at 34; 70 Am.Jur.2d, *Shipping*, § 493. When they do so, the carrier's status upon discharge of the cargo becomes that of a bailee. *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F. 2d 800, 807 n. 5 (2d Cir. 1971); *David Crystal, Inc. v. Cunard S.S. Co.*, 339 F. 2d 295 (2d Cir. 1964), 297-298. The carrier's general duties regarding delivery, nevertheless, remain the same. Absent the consignee, to constitute a "proper delivery" due and reasonable notice must be given to the consignee of the intended delivery and the goods must be placed in a suitable place and under proper care and custody. *Constable v. National S.S. Co.*, 154 U. S. 51, 14 S. Ct. 1062, 38 L. Ed. 903 (1894).

Overseas contends that "proper delivery" was effected "within a very few days of discharging Globemaster cartons to Cottman's Pier, since Arrival Notices had earlier been sent to Globemaster, thereby affording a fair and reasonable opportunity to remove the goods." Overseas contends that it became a bailee upon discharge of the cargo and that its responsibilities as a bailee ended completely upon the expiration of the "free time" when Cottman's agency relationship with Overseas ceased and Cottman's obligations, as bailee for hire, became those of a warehouseman responsible only to Globemaster. See *Grover-Ferguson Company, Inc. v. A/S Ivarans Rederi*, 171 F. Supp. 766 (E.D. Pa. 1959). It is unnecessary, however, to decide when "proper delivery" was effected or when Overseas' status as a carrier and bailee terminated, since it is clear, as will hereinafter appear, that the trial court's judgment that Overseas is liable to Globemaster was based on conduct which occurred prior to discharge of the cargo.

Judge Liss imposed liability on Overseas, Clark, and Cottman on the basis that all three failed to use reasonable care in the handling of the cargo. As to Overseas, Judge Liss found specifically:

"[T]he bill of lading clearly indicates there was no

exception taken to the delivery of merchandise by Globemaster in Kobe, Japan.

Now the merchandise is then delivered here in Baltimore, and the Court finds as a fact that the merchandise was delivered to Baltimore in a severely damaged condition. While the Court recognizes that Mr. Yealdhall, obviously, is going to put the best possible face on his testimony so as to absolve himself, if it's possible to do so, even allowing for exaggeration, the Court finds there's no question that a number of the cartons that were in the hold of that ship were in a broken condition; and that the merchandise was loose; that there were tools strewn about in the hold, or in various holds, and that there was substantial damage to the merchandise received, in the Port of Baltimore.

... the indication is that at least six percent of the cargo was not ultimately delivered, and I would think that figure is reasonably correct so far as the damage is concerned.

Now what is the effect assuming that the merchandise was, in fact, delivered to Baltimore in this condition? Then it seems to me that the ship was under an obligation to so note on its records, and to have the person who was in charge of the unloading or who, at least, was observing the unloading of the ship, take the necessary precautions to see that there was no further loss and to make the necessary notification, both to Globemaster and/or to Clark Company, and to The Cottman Company that there was a possibility that there would be some claim arising out of the condition of the merchandise. The ship failed to do so.

I do accept as a fact that the ship does not have someone watching the unloading of material from its holds. Common sense indicates to me that if only to prevent merchandise that should not be unloaded stolen and/or unloaded by mistake, that

the ship either has or should have had someone on the premises to supervise what is going on. The Court believes that there was, and that apparently nothing was done about it, and that that is a failure to use reasonable care under the circumstances."

Overseas argues that the finding of the trial court that the cargo arrived in Baltimore in a severely damaged condition was clearly erroneous and that, in any event, the trial court did not find a shortage of handtools upon discharge or while the cargo was in Clark's possession before transfer to Cottman, nor could such a finding arise merely because of damage to the cardboard cartons. Overseas maintains that it fulfilled its duties both as carrier before discharge of the cargo and later as bailee during the five days "free time" following discharge of the cargo. It argues that it accounted for all of the cargo by means of the tally records compiled by Clark in the ordinary course of business and that Cottman, which made no independent tally, should have been estopped at the trial from questioning the accuracy of those records. Overseas states that Globemaster's showing of a shortage in cargo many weeks after discharge did not amount to a showing that a shortage occurred during the time Overseas was responsible. It relies on the presumption that where goods pass through the hands of successive custodians, in apparent good order, any loss is presumed to have occurred while they were under the control of the last custodian. *Julius Klugman's Sons v. Oceanic Steam Nav. Co.*, 42 F. 2d 461 (S.D.N.Y. 1930), citing *Chicago & N.W. Ry. v. Whitnack Produce Co.*, 258 U. S. 369, 372 (1922). It contends further that under this presumption, which also applies under Maryland law [4] (*N.Y. & Balto. Trans. Line v. Baer*, 118 Md.

---

4. Maryland law applied to Globemaster's claims against Cottman. Cottman acted as the agent of Overseas in performing the terminal operations and storing the cargo on its pier. As to Globemaster, however, it was merely a bailee of the cargo. It was not a party to the bill of lading — the contract of carriage — between Overseas and Globemaster. As such, it was not liable to Globemaster contractually for any loss or damage. Globemaster's claims against Cottman were based on tortious conduct which occurred on land. It is clear, therefore, that the claim is not within federal admiralty jurisdiction but is governed by local law. *Leather's Best, Inc. v. S.S. Mormaclynx, supra*, at 807-808, 813 (2d Cir. 1971).

73, 80), Cottman, which did not rebut the presumption, must bear the entire loss.

In deciding whether the trial court was clearly erroneous in its findings that the cargo arrived in Baltimore in a severely damaged condition and that Overseas did not use reasonable care in the handling of the cargo, we are, of course, guided by the "clearly erroneous" principle. "[T]he judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." Md. Rule 1086. The Second Circuit United States Court of Appeals, in applying in an admiralty case the "clearly erroneous" principle embodied in Federal Rule of Civil Procedure 52 (a),[5] which is essentially the same as our Maryland rule, stated well the scope of our power of review:

> "A fair statement of the rule is that we may not set aside a finding of fact unless we are left with the 'definite and firm conviction that a mistake has been committed,' . . . and that we will reverse 'most reluctantly and only when well persuaded.' . . . We must respect the evaluation of credibility made by the trial judge of the witnesses present before him. . . . What this comes down to in substance is that we must take a good, hard look at the record as a whole, and when all is said and done, given the unavoidable division of function between a trial and an appellate court, we should only reverse when fairly well persuaded." *M.W. Zack Metal Company v. S.S. Birmingham City*, 311 F. 2d 334, at 337-338 (2d Cir. 1962).

Our function then is to examine the lower court's findings in sufficient detail to determine whether or not each of them should stand or be set aside as clearly erroneous and then to

---

5. Federal Rule of Civil Procedure 52 (a) provides in pertinent part:
"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

determine whether or not they are decisive of the case in view of the applicable principles of law. *M.W. Zack Metal Company v. S.S. Birmingham City, supra,* 311 F. 2d at 338.

The trial court's finding that "the merchandise was delivered to Baltimore in a severely damaged condition" by Overseas clearly referred to damage to the cardboard cartons and not to the handtools per se. Taking into account, as the trial judge did, the effort on the part of the witness Yealdhall, Cottman's pier superintendent, "to put the best possible face on his testimony so as to absolve himself," there was, nonetheless, sufficient testimony not only from Yealdhall but also from the witnesses Byan and Hughes that a number of cartons were broken in the hatches and that loose handtools were strewn about the holds of the vessels. As the cargo was unloaded, the loose handtools were placed in the middle of the pallets. We cannot say that the court's finding that the merchandise was in a severely damaged condition upon discharge was clearly erroneous.

Overseas argues, however, that since Globemaster's claim was for a shortage in handtools rather than damage to them, it is not liable to Globemaster since there was no showing of any loss before discharge or while the cargo was in Clark's possession before transfer to Cottman.

The clean bills of lading were prima facie evidence that Overseas received the quantity of cargo specified therein and in good condition. 46 U.S.C. § 1303 (4). The burden then fell on the carrier to explain or account for the shortage in handtools upon delivery to the consignee. *Scott v. W. R. Grace & Co.,* 275 F. 340 (2d Cir. 1921); *Holden v. S.S. Kendall Fish,* 212 F. Supp. 106 (E.D. La. 1962); *Wirth Ltd. v. S.S. Acadia Forest,* 376 F. Supp. 785 (E.D. La. 1974); *Flota Mercante Del Estado v. Orient Ins. Co.,* 198 F. 2d 740 (5th Cir. 1952); 80 C.J.S., *Shipping,* § 154 (c) 2. Overseas denied any shortage upon discharge, relying on Clark's tally records, or any loss whatsoever while it was responsible for the cargo. Judge Liss, properly we feel, gave no weight to the tally records as indicative of how much cargo was unloaded from the ships. Clark's checker, Hughes, testified clearly that the tally made by the checkers was a rough estimate

rather than an actual count. There was no indication, therefore, how much cargo was unloaded from the vessels.

Overseas, in the alternative, however, seeks to rely on a general principle of bailment law to relieve itself of liability. Where it is shown that goods when delivered to the consignee by the last of several custodians were short in quantity, the presumption is that the missing goods were delivered to such last custodian with the burden being upon him to explain the shortage. *Julius Klugman's Sons v. Oceanic Steam Nav. Co.*, 42 F. 2d 461, 1930 A.M.C. 1445 (S.D.N.Y. 1930). Overseas thus seeks to place responsibility for the shortage on Cottman. This presumption, however, does not apply in this case where the evidence clearly indicated that many of the cartons delivered to Cottman were broken and mashed and that many handtools were in a loose condition when Cottman received them. The cargo was not "in apparent good order." 42 F. 2d at 462.

Independent of any liability based on Overseas' failure to rebut the prima facie case against it by showing that it delivered all the cargo that it received, there was sufficient evidence that Overseas did not use reasonable care prior to discharge in protecting the cargo from damage and subsequent loss. The cargo was entrusted to Overseas for safe carriage and delivery. Regardless of how the cartons were broken in the holds of the vessels during transit, Overseas was obligated to take reasonable precautions to avoid further damage to them. This duty continued until "proper delivery" of the goods. *Fabbri Co. v. Universal Shipping Corp.*, 310 F. Supp. 964 (S.D.N.Y. 1969). Its failure to notify Globemaster of the substantial damage to the cartons or to notify its agents, Clark and Cottman, to take the necessary precautions to avoid the inevitable possibility of pilferage or other loss constituted ample evidence of lack of reasonable care. This alone was enough to hold Overseas liable to Globemaster.

### Globemaster v. Clark

As to Clark, Judge Liss found specifically:

"The Court further finds that the merchandise, as taken control of by Clark, was in a damaged

condition; that Clark's employees, through the documents which have been attempted to be introduced here as exculpating Clark — prepared documents which obviously are not substantiated by the facts — it's admitted by Clark's employees that the count that is made of the merchandise which is delivered to the terminal company is an estimate rather than an actual count — and since it is an estimate, so far as the Court is concerned, it does not have the probative value to prove that Clark did deliver to the pier what it says it delivered to the pier.

The Court also finds as a fact that a substantial portion of the merchandise was delivered to the terminal company in a broken condition, and that Clark failed to make any exceptions or note on its documents, indicating that it was delivering merchandise received in that condition, or that it made any effort whatsoever to give notice to Cottman or to Globemaster, or to the ship, that there were, in fact, problems with this particular shipment."

Clark argues that there was no legally sufficient evidence to establish that its employees pilfered the cargo or that any of it disappeared while in its possession. Clark, in the alternative, relies upon *N.Y. & Balto. Trans. Co. v. Baer, supra,* at 118 Md. 80, for the legal presumption that where the plaintiff shows the quantity of goods delivered to the initial carrier and "upon the delivery to the consignee by the terminal carrier, there is found a shortage in the quantity of goods that had been delivered to the initial carrier, the presumption is, when such last named carrier is made defendant, that all the goods delivered to the initial carrier were received by the terminal carrier, and the burden is upon such terminal carrier of proving that the goods so delivered by it to the consignee were all the goods that came into its possession." Clark argues that since Cottman did not make an independent count of the cargo nor verify Clark's tally records, Cottman should bear responsibility for the

shortage because it failed to produce any evidence as to the number of cartons it received. Judge Liss found that Clark was negligent in failing to note the condition of the cargo on its discharge documents and in failing to give notice to the other parties of the condition of the cargo.

Clark argues on appeal, however, that this was not the proximate cause of the loss because representatives of Cottman and Overseas were present during the discharge operation and saw the condition of the cargo. Clark argues that it was rather Cottman's failure to place all of the broken cartons in the cage that precipitated the loss. Clark relies again on *N.Y. & Balto. Trans. Line v. Baer* for the proposition that where a claim is for shortage as opposed to damage to cargo, whether or not a carton may have been damaged in transit and whether or not there was a failure to note such damage are irrelevant considerations.

As hereinbefore stated regarding Overseas's contention, Clark's reliance on the presumption from *N.Y. & Balto. Trans. Co. v. Baer, supra*, to place all responsibility for the shortage on Cottman is without substance. Although it is true that there was no evidence as to when the shortage in handtools actually occurred, there was ample evidence to support the trial court's finding that Clark did not use reasonable care in handling the cargo which contributed to the loss.

A stevedore owes the same duty of care as the carrier under COGSA, that is to handle the discharge of the cargo properly and carefully. *Interstate Steel Corp. v. S.S. Crystal Gem*, 317 F. Supp. 112 (S.D.N.Y. 1970). "The stevedore must possess a reasonable degree of skill, expertise, and competence, and must use the care and diligence that ordinarily prudent and skillful persons would have used in the same circumstances." Doak, *Liabilities of Stevedores, Terminal Operators, and Other Handlers in Relation to Cargo*, 45 Tulane L. Rev. 752, at 757 (1971). Where it fails to do so, it is liable to the cargo owner for the loss or damage caused by its negligence. *Robert C. Herd & Co. v. Krawill Machinery Corp., supra.*

The evidence established that many of the cartons

delivered to Cottman were broken. The evidence established that despite the condition of the cartons upon discharge from the ships' holds, the stevedores, nevertheless, stacked the pallet-loads of cardboard cartons unevenly on the pier and three or four tiers high. As a result, more cartons fell and broke open. Despite the condition of the cargo, no notification was given to Globemaster or the other parties to take any special precautions. Although Clark's Vice-President, Steven Byan, was aware of the condition of the cargo and admitted that exceptions should have been taken to the cargo, he did nothing to have the cartons recoopered. In addition, inaccurate tally records were prepared. In *Demsey & Associates v. S.S. Sea Star*, 321 F. Supp. 663 (S.D.N.Y. 1970), aff'd in part and rev'd in part on other grounds, 461 F. 2d 1009 (2d Cir. 1972), a case where cargo was damaged prior to discharge but where the stevedore, nevertheless, did not notify the consignee but proceeded to discharge the cargo and further damage it, the court, in speaking of the degree of care required of a stevedore, stated:

> "The coils consigned to Interstate were discharged by Pittston [stevedore] in a negligent manner, and Pittston is liable to Interstate for the damage suffered by the coils during discharge at Chicago . . . .
>
> While Pittston contends that damage during discharge was unavoidable due to the damaged condition of many of the coils prior to discharge, the evidence establishes that substantial additional damage was due to Pittston's improper discharge. While the unloading of the coils called for a high degree of professional skill, Pittston held itself out as possessing this professional skill. Had Pittston felt that the condition of the coils would risk substantial additional damage in unloading, it should have so notified Interstate prior to discharge." (Citations omitted) 321 F. Supp. at 670-671.

In view of Clark's inaccurate tally, its failure to take any

exceptions to the cargo, and its manner of discharging the cargo, Clark cannot now disclaim all responsibility for any loss.

## Overseas v. Clark and Cottman

Overseas contends that "the lower court erred as a matter of law in denying its cross-claims seeking full indemnity from Clark and/or Cottman when the cross-claims were based primarily upon breach of warranties running to Overseas from both of the cross-claim defendants as a matter of maritime contract."

Overseas's contract with Clark to unload and tally the Globemaster cargo and place it in Cottman's shed was a maritime contract and is governed by substantive maritime law. *American Stevedores, Inc. v. Porello*, 330 U. S. 446, 456, 67 S. Ct. 847, 91 L. Ed. 1011 (1947). Under maritime law, a stevedore, absent a contrary contractual provision, gives the carrier an implied warranty of proper and workmanlike performance. *Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Co.*, 350 U. S. 124, 76 S. Ct. 232, 100 L. Ed. 133 (1956); *David Crystal, Inc. v. Cunard S.S. Co.*, 339 F. 2d 295, 299 (2d Cir. 1964); *Stein Hall & Co., Inc. v. S.S. Concordia Viking*, 494 F. 2d 287 (2d Cir. 1974). This warranty has been characterized as "comparable to a manufacturer's warranty of the soundness of its manufactured product." *Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Co., supra*, 350 U. S. at 133-134. A stevedore's negligence may be a breach of such warranty entitling the carrier to indemnity for the liability imposed on it by such substandard performances. *Eutectic Corp. v. M/V Gudmundra, supra*. Even absent negligence, however, under this warranty, liability has been imposed on the stevedore where the stevedore was in a better position than the shipowner to reduce the risk of damage or loss. Since this theory of indemnity is contractual, even the carrier's concurrent negligence is not necessarily a bar to recovery. *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U. S. 315, 84 S. Ct. 748, 11 L.Ed.2d 732 (1964). See generally Doak, *Liabilities of Stevedores, Terminal Operators, and*

*Other Handlers in Relation to Cargo,* 45 Tulane L. Rev. 752 (1971).

Overseas also contends that its contract with Cottman permitting vessels to tie up at the pier and discharge cargo into the transit shed was a maritime contract and that under it Cottman gave the same implied warranty (under the law then applicable) as Clark to perform in a workmanlike manner. We need not reach this question, however. An extended discussion of Overseas' indemnity claim against Clark and Cottman is unnecessary, since we agree that the trial court's ruling that Overseas, on the basis of its conduct, is not entitled to indemnity was correct.

A carrier is liable to a shipper for the negligence of its agents — the stevedore and the terminal operator. *Levatino Co. v. M/S Helvig Torm,* 295 F. Supp. 725 (S.D.N.Y. 1968); *Leather's Best, Inc. v. S.S. Mormaclynx, supra.* Indemnity principles allow a shipowner to recover, however, from the stevedore and the terminal operator where the shipowner is held liable for damage or loss caused by them. Where, for example, a shipper makes a prima facie case against a carrier on the basis of clean bills of lading and outturn of cargo in a short or damaged condition, the carrier may recover from the stevedore and/or terminal operator by proving the damages were caused by them. See *Levatino Co. v. M/S Helvig Torm, supra.* Judge Liss here did not rely, however, on the bills of lading as establishing a prima facie case against Overseas when it failed to show that it delivered all that it received but instead imposed liability on Overseas for failure to use reasonable care in the handling of the cargo prior to discharge. Whether Clark's failure to provide an adequate tally of the cargo was a breach of its implied warranty of proper and workmanlike performance or whether Cottman, assuming it was bound by the same warranty, breached it by inadequately storing and protecting the cargo, are irrelevant considerations. The trial court was not wrong in holding that Overseas, based on its own conduct prior to discharge, is precluded from seeking indemnity. *Weyerhaeuser S.S. Co. v. Nacirema Operating Co.,* 355 U. S. 563, 78 S. Ct. 438, 2 L.Ed.2d 491 (1958).

*Damages*

Globemaster's cross-appeal on the issue of damages involves the trial court's denial of pre-judgment interest and the refusal to allow recovery of U.S. Customs duty, inland freight charges, proportionate bank charges and proportionate insurance charges that were paid on the merchandise that was not delivered.

Howard Satter, Vice-President of Globemaster, testified on the issue of damages from a series of import claim sheets, which were introduced into evidence. He described each of the items of damages as follows:

1. Proportionate Customs duty: ". . . We paid U.S. Customs duty based upon the value of all the merchandise shown on that supplier's invoice and on the bill of lading. We are now charging back the value of the duty that we paid out for the merchandise not received."

2. Proportionate ocean freight: ". . . We paid ocean freight based upon the weight of the entire shipment as shown on the ocean bill of lading. We are now charging back a proportionate share of the amount of the ocean freight for the merchandise not received."

3. Proportionate inland freight: ". . . we prorated that the same as we did the ocean freight."

4. Proportionate bank charges: "We paid our supplier by letter of credit. Our bank drew an amount of money equal to the total value of the supplier's invoices, and they are entitled to their fee for handling this transaction. We charged back a proportion of that amount of their fee to cover the value of the merchandise that we did not receive."

5. Proportionate insurance charges: "We carry a marine insurance policy, and the policy is based upon the value of the merchandise shipped, which is the supplier's invoices, and so we charge back the insurance on the merchandise not received."

The following stipulation was then read into the record by the court:

" [It is] agreed then, gentlemen, that this witness would testify as follows: . . . that the total invoiced value of that merchandise which was not delivered to Globemaster amounted to $18,033.55; that the proportionate ocean freight would be $851.14; that the proportional duty would be $2,905.10; that the proportional inland freight would be $272.39; that the proportional bank charges would be $112.71; that the proportional insurance charges would be $105.87; and the proportional customs broker charges are $55.73, for the total of $22,336.70, less the invoice value of goods received not applicable to bills of lading involved in this action of $498.79, for a total of $21,837.70."

On the basis of the evidence, the trial court made the following findings as to damages:

"The Court: . . . Now, as to the damage, I am going to accept Mr. Gorman's value of $18,036.98, the proportionate share of shipping costs, $851.14, and the proportionate brokerage charge of $55.73. The Court will not allow the proportionate duty because the Court feels that the duty could have been recovered, or at least, an effort should have been made to recover the duty from U.S. Customs Service, and will not, under those circumstances, require the defendants to pay sums which are paid to the federal government rather than to them. The same thing is true with respect to the figure for Inland Freight. Since the freight figures were based on the cost of the merchandise actually received. Also, the bank charges strike me as being unusual under the circumstances, and the Court will not include these, nor will the Court include the insurance charges for the reasons Mr. Gorman indicates, and that is, no claim was made on the insurance company, and obviously no insurance charge should be charged against the defendants.

Now, Globemaster made a claim against Phillips, the inland trucker, for $2,148.00, representing merchandise not delivered by Phillips. A deduction of this amount from the gross figure leaves a net of $16,795.02.

The Court has considered the question of interest, and for a number of reasons, not the least of which is the fact that apparently this claim was delayed for a period of some three to four years, has decided not to grant interest, at least a portion of that delay is chargeable to Globemaster. In addition to which, I think Clark was not brought into the case until some three years had elapsed, plus the fact that there certainly were some substantial questions as to whether or not the defendants in this case were, in fact, liable to Globemaster. The granting of interest under these circumstances would amount to an unfair and unreasonable burden on the defendants if I added to the almost $17,000.00 an additional $5,000.00 in interest charges. Since it is discretionary with the Court, the Court will not grant interest and will not consider that in its decision."

We see no error in the court's disallowance of the above items of damages. With respect to the pre-judgment interest, we are well aware that this is a proper item of consideration in assessing damages in a case such as this. See *Pine Street Trading Corporation v. Farrell Lines, Inc., supra.* It is, nevertheless, an item which is in the sound discretion of the trial judge. *Robert C. Herd & Co. v. Krawill Machinery Corporation,* 256 F. 2d 946 (4th Cir. 1958). Based on the reasons given by the trial judge for the denial, we see no abuse of discretion. See *Maryland Shipbuilding & Drydock Co. v. Patapsco Scrap Corp.,* 169 F. Supp. 605 (D. Md. 1959), aff'd. 268 F. 2d 817 (4th Cir. 1959).

*Judgments affirmed; costs to be paid $1/2$ by appellants Overseas and Clark combined; $1/4$th by appellant Overseas; $1/4$th by cross-appellant Globemaster.*